UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID DRUCKMAN,

Plaintiff,

-v-

PETER MORGENSTERN, P.MORGENSTERN LLC *and* BUTZEL LONG, A PROFESSIONAL CORPORATION,

Defendants.

26 Civ. 993 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff David Druckman here seeks compensation for work he claims to have done, between 2009 and 2016, assisting defendants Peter Morgenstern, P.Morgenstern LLC (collectively, the "Morgenstern defendants" or "Morgenstern"), and Butzel Long, P.C. ("Butzel Long"), in lawsuits they brought on behalf of victims of a Ponzi scheme by Stanford International Bank and others. Now pending are (1) the Morgenstern defendants' motions to dismiss all claims against them and to strike portions of the Complaint; and (2) Butzel Long's motion to dismiss the two claims against it. *See* Dkts. 16, 19, 22.

For the following reasons, the Court grants the motions to dismiss and denies the motion to strike as moot.

# I. Background

## A. Factual History[1]

### 1. Druckman, Morgenstern, and the Stanford Ponzi Scheme

#### *a. The Parties*

Druckman is a criminal-law and personal-injury attorney. Dkt. 1-1 ("Compl.") ¶ 11. In 1986, he opened his law practice in the Bronx. *Id*. Between 2009 and 2016, he maintained a law office there. *Id*. He was raised in Puerto Rico and speaks fluent Spanish. *Id*.

Peter Morgenstern is a New York attorney. *Id*. ¶ 12. He founded and owned the New York–based law firm Morgenstern & Blue, LLC ("Morgenstern & Blue"), where he focused on bankruptcy, creditors' rights, and commercial litigation. *Id*.

P.Morgenstern LLC is a New York limited liability company whose sole member is Morgenstern. *Id*. ¶ 13.

Butzel Long is a Michigan corporation that maintained offices in Manhattan at all relevant times. *Id*. ¶ 14.

#### *b. Druckman and Morgenstern's Personal Relationship*

Druckman and Morgenstern met at summer camp in 1969 and became friends. *Id*. ¶ 17. After attending law school, they moved across the street from each other and remained neighbors for 25 years. *Id*. ¶ 18. They were part of a small group of couples who socialized frequently. *Id*. ¶ 19. Their wives also became friends; their families socialized regularly in their homes and celebrated holidays and life events like weddings and bar mitzvahs. *Id*. The two were "very

[1] The Court draws this account from the Complaint, Dkt. 1-1 ("Compl."). For the purpose of resolving the motions to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in Druckman's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

close in both good times and bad." *Id.* ¶ 20. Druckman consoled and supported Morgenstern when his brother died and in connection with Morgenstern's struggles with alcohol. *Id.*

*c. The Stanford Ponzi Scheme*

On February 16, 2009, the Securities and Exchange Commission ("SEC") filed an action against Stanford International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC, R. Allen Stanford, and Laura Pendergest-Holt (individually and collectively, "Stanford"). *Id.* ¶¶ 21, 37. The SEC's investigation revealed that Stanford had perpetrated a $7.2 billion Ponzi scheme by selling fraudulent certificates of deposit to investor-victims located primarily in Central and South America (the "Stanford Ponzi scheme"). *Id.* Stanford had represented to these investors that the certificate-of-deposit proceeds were invested exclusively in low-risk, high-return funds. *Id.* ¶ 22. Instead, the proceeds were used to fund R. Allen Stanford's extravagant lifestyle and to pay off his previous investors. *Id.* Enabling the scheme were numerous banks that either knew or should have known that Stanford's operation was unlawful. *Id.* ¶ 23. These banks provided services to Stanford, including collecting funds from Stanford's defrauded investors. *Id.* To the extent that the banks had transferred fraud proceeds to Stanford in furtherance of his scheme, these funds were recoverable by Stanford's investor-victims as fraudulent transfers. *Id.*

The court overseeing the SEC action appointed a receiver, Ralph S. Janvey, to "take and have complete and exclusive control, possession, and custody of the Receivership Estate and [] any assets traceable to assets owned by the Receivership Estate." *Id.* ¶ 24.

**2. Druckman's Work Supporting Morgenstern's Client Representations**

*a. Morgenstern Solicits Druckman*

After the SEC action commenced in February 2009, Morgenstern had the idea to bring civil actions against the banks and law firms that had facilitated the Stanford Ponzi scheme. *Id.*

¶¶ 25, 27. He traveled to Mexico City to meet potential clients—defrauded investors—with the goal of their retaining him. *Id.* ¶ 27. But, because Morgenstern and his law partner, Gregory Blue, do not speak Spanish, he was unable to persuade many Stanford investors to retain him. *Id.* ¶¶ 26–27.

Morgenstern solicited Druckman, who is fluent in Spanish, for "assistance." *Id.* ¶ 28. He told Druckman he needed a skilled Spanish-speaking attorney to help retain investor-victims as clients, whom Morgenstern would represent in civil actions. *Id.* Morgenstern "strongly enticed" Druckman by representing that the "recovery was potentially enormous." *Id.* ¶ 29.

Morgenstern and Druckman agreed that they would "work together" to secure "relief for as many Stanford investors as possible" and would "share any awards, recoveries, and legal fees recovered in the proportion of the work they performed." *Id.* ¶ 30. Morgenstern told Druckman that Druckman would receive his *pro rata* share of any recovery "based upon the time he put in as a function of the amount received." *Id.* Druckman trusted Morgenstern as a "close" family friend. *Id.* ¶ 31. Their fee-sharing agreement was not documented. *Id.*

*b. Druckman and Morgenstern Begin to Retain Clients*

On March 26, 2009, Druckman and Morgenstern traveled to Mexico City to recruit Stanford investor-victims as clients. *Id.* ¶ 32. They were met with "skeptic[ism]" and were unsuccessful. *Id.* During the trip, Morgenstern met with a large investor. *Id.* ¶ 33. He told Druckman that guns had been drawn during the meeting. *Id.* From then on, Druckman and Morgenstern traveled with security in Central America. *Id.*

On April 21, 2009, Druckman and Morgenstern returned to Mexico City. *Id.* ¶ 34. During the four-day trip, they were retained by a set of hundreds of investors. *Id.* Morgenstern told Druckman that the "goal" thereafter was for Druckman to secure their retention by as many

clients as possible. *Id*. Toward the end of the trip, Druckman fielded an "onslaught" of calls and inquiries from investors. *Id*. ¶ 35.

*c. Morgenstern Intervenes in the SEC Action*

On May 11, 2009, Morgenstern moved to intervene in the SEC action against Stanford on behalf of three Stanford investors—Samuel Bukrinsky, Jaimie Alexis Arroyo Bornstein, and Mario Gebel—whom Morgenstern & Blue represented. *Id*. ¶ 39. Druckman had met and discussed the case with Bukrinsky and Bornstein in Mexico, and signed Morgenstern's name on retainer agreements with them. *Id*. ¶ 40.

Morgenstern's declaration in support of the motion stated that the three investors represented a group "comprised of approximately 400 individuals and entities" who collectively had lost more than $100 million as a result of the Stanford Ponzi scheme. *Id*. ¶ 41. It described the group as consisting "almost entirely of foreign citizens" who had "acted quickly" to become familiar with the proceedings and their rights and had "consult[ed] with American counsel concerning their options." *Id*. ¶ 42. Druckman had gathered this information, educated the investors about their rights, and consulted with them about their options. *Id*.

On August 23, 2009, while the motion was pending, Morgenstern commenced a separate action: a putative class action against five banks that allegedly participated in the Ponzi scheme: HSBC Bank PLC ("HSBC"), the Toronto-Dominion Bank ("TD Bank"), Independent Bank, formerly known as Bank of Houston ("IB"), SG Private Banking Suisse ("SG Suisse"), and Trustmark National Bank ("Trustmark") (collectively, the "bank defendants"). *Id*. ¶ 43.

*d. The Official Stanford Investors Committee Is Created*

On February 11, 2010, the court overseeing the SEC action against Stanford discussed with the Examiner for the Stanford matter and with Blue about forming a creditors' committee. *Id*. ¶ 44. On August 10, 2010, the court created the Official Stanford Investors Committee (the

"OSIC"). *Id.* ¶ 46. The court directed the OSIC to represent certain of the Receivership estate's creditors and, by assignment from the Receiver, to investigate and pursue claims on behalf of the investors and the estate. *Id.* On January 10, 2011, the Receiver, the Examiner and the OSIC jointly moved for approval of an agreement under which the OSIC would commence fraudulent transfer lawsuits against persons who had marketed or sold Stanford certificates of deposit to investors. *Id.* ¶ 47. The OSIC would be the named plaintiff in such actions, and the OSIC-appointed counsel would be paid on a 25% contingency-fee basis. *Id.* That motion identified the OSIC's members, who included the Examiner as chairman, Morgenstern, and Angela Shaw Kogutt ("Shaw"), with whom Druckman alleges Morgenstern began an extramarital affair. *Id.* ¶ 48. On January 12, 2011, the Examiner reported that the OSIC had hired six law firms, including Morgenstern & Blue, to represent it in the litigations, in return for a 25% contingency-fee.[2] *Id.* ¶ 49. On February 25, 2011, the Court granted the motion, authorizing the OSIC to retain Morgenstern & Blue. *Id.* ¶ 50.

*e. Early Litigation Efforts Continue*

Druckman describes the working relationship on the litigations among himself, Morgenstern, and Blue as a "small team of three attorneys" with "distinct roles." *Id.* ¶¶ 51–52. Morgenstern "focused on communications with co-counsel, his adversaries, the Court, the Examiner, [and] the Receiver" and on "coordinating procedure and strategy." *Id.* ¶ 53.

[2] This arrangement was later revised. On April 15, 2014, Butzel Long and another firm, Friedman Kaplan, executed an agreement under which the firms would be compensated for their work for the OSIC via a contingent fee comprised of 25% of the net recovery resulting from any claim brought against the five bank defendants. Compl. ¶ 50 n.1. On October 1, 2019, four law firms representing the OSIC executed an agreement under which Butzel Long and Friedman Kaplan would be compensated exclusively from the net recovery resulting from the OSIC's claims against TD Bank, HSBC, and SG Suisse, and the other two would be compensated exclusively from the net recovery resulting from the OSIC's claims against Trustmark and IB. *Id.*

Druckman's responsibilities included facilitating client retentions, traveling to Central and South America to confer with existing and potential clients, and communicating with clients about case updates and their files. *Id*. ¶ 54. Druckman "worked out of Morgenstern & Blue's office" until Morgenstern separated from Blue and joined Butzel Long, after which point he worked out of Butzel Long's office "several days a week." *Id*. ¶¶ 54, 56. Blue focused on "researching legal issues and drafting litigation documents." *Id*. ¶ 55. When Morgenstern and Blue separated, Josh Abraham at Butzel Long took on Blue's duties. *Id*. Butzel Long secretary Susan Gartner "supported Morgenstern and Druckman," and had daily contact with Druckman. *Id*. ¶ 56.

*f. Morgenstern and Butzel Long Bring the Law-Firm Suit; the OSIC Intervenes in the Firm and Bank Suits*

On November 15, 2012, Morgenstern and Butzel Long commenced a second class action against two law firms for furthering Stanford's fraud: Hunton & Williams and Greenberg Traurig (collectively, the "firm defendants"). *Id*. ¶ 64. Morgenstern and Butzel Long intervened in this action on behalf of the OSIC. *Id*. ¶ 65. On June 2014, Druckman traveled to Miami, in connection with this action, to review hundreds of thousands of pages of documents at Greenberg Traurig's offices. *Id*. ¶ 66. During that trip, Druckman discovered a document that showed that Greenberg Traurig had been aware of the Stanford fraud and willfully ignored it. *Id*. ¶ 67. As to the putative class action that Morgenstern had commenced against the five bank defendants, on December 5, 2012, Morgenstern moved to intervene in it on behalf of the OSIC. *Id*. ¶ 60. That motion was granted, and on February 15, 2013, the OSIC filed an intervenor complaint against the bank defendants. *Id*. ¶ 61.

*g. Morgenstern Commences a NAFTA Arbitration*

In late 2012 or early 2013, Morgenstern had the idea to commence an arbitration against the United States under Article 1116(1) of the North American Free Trade Agreement

("NAFTA") on behalf of North American investor-victims of the Stanford Ponzi scheme, on the theory that the federal government had failed to protect investors. *Id.* ¶ 70. Druckman and Morgenstern reported the arbitration to their Mexican clients and asked them to sign a new retainer agreement covering the NAFTA action. *Id.* ¶ 71. They had "only . . . some success" in getting retained. *Id.* To drum up retentions, Druckman, "[e]very day" for four months, reached out to Mexican clients to explain the benefits of the new retention. *Id.* ¶ 72. Druckman amassed a group of thousands of Mexican Stanford investors. *Id.* ¶ 73. On March 29, 2013, Morgenstern filed a NAFTA arbitration against the United States. *Id.* ¶ 74. It sought $511,199,245 in compensation. *Id.* at 18 ¶ 69.[3] Druckman signed the arbitration pleading on behalf of Butzel Long and P.Morgenstern LLC. *Id.* at 18 ¶ 70. Druckman thereafter was not updated about the arbitration. *Id.* at 18 ¶ 71.

*h. Druckman Performs Work on Behalf of the Stanford Litigations*

Between 2009 and 2016, Druckman worked "continuously" with Morgenstern on behalf of the Stanford investor-victims. *Id.* ¶ 90 (cleaned up). Druckman's work entailed the following.

In 2009, Druckman worked 520 billable hours. *Id.* ¶ 102. In March and April, he accompanied Morgenstern on two trips to Mexico to recruit clients. *Id.* ¶ 91. In May, the two returned to Mexico City to meet potential clients. *Id.* ¶ 93. Druckman returned to Mexico City in June alone, and in July with Morgenstern. *Id.* ¶¶ 94–95. On return, he was "swamped" with inquiries from clients. *Id.* ¶ 96. In September, Druckman and Morgenstern traveled to Bogotá, Colombia, to recruit clients. *Id.* ¶ 98. From there, Druckman proceeded alone to Cali and

[3] Duplicated paragraph numbers 69 through 71 intercede between paragraphs 74 and 75 on page 18 of the Complaint. *See* Compl. at 17–18. In citing the second of the repeated paragraphs, this decision adds the page number—18—for clarity.

Medellín, Colombia. *Id.* ¶ 99. Upon return, he fielded hundreds of calls and emails from Colombian investors. *Id.* ¶ 100. In 2009, he spent two days a week working from Morgenstern & Blue's New York offices. *Id.* ¶ 101.

In 2010, Druckman worked 620 billable hours. *Id.* ¶ 108. He made more trips to Mexico to recruit and meet clients. *Id.* ¶ 103. He built a master client list and communicated with retained and potential clients, who spoke Spanish and were generally elderly. *Id.* ¶¶ 104–105. He answered their questions and explained the retainer agreement in Spanish. *Id.* ¶ 106. He signed Morgenstern's name on the retainer agreement on Morgenstern & Blue's behalf. *Id.*

In 2011, Druckman worked 580 billable hours. *Id.* ¶ 126. He and Morgenstern traveled to Caracas, Venezuela, to recruit clients. *Id.* ¶ 109. On that trip, Druckman and Morgenstern were accompanied by security and, at times, escorted by armed guards. *Id.* ¶ 111. As a result of the trip, Druckman exchanged (through an intermediary) names and contact information with 2,000 members of a group of Stanford investors—the Stanford Victims Coalition of Latin America ("COLViSAL"). *Id.* ¶¶ 109, 113. As a result, Druckman received "constant phone calls and emails from potential [clients]." *Id.* ¶ 114. COLViSAL ultimately did not retain Morgenstern. *Id.* ¶ 115. Simultaneously, Druckman was in daily contact with Mexican clients. *Id.* ¶ 116. He also corresponded with the Receiver in the SEC action, who was reviewing client documentation for deficiencies. *Id.* ¶ 118. When the Receiver sometimes required additional information from clients, Druckman translated the requests and documents. *Id.* ¶¶ 119–120. He also translated periodic updates from Morgenstern or other lawyers on the case. *Id.* ¶ 121. Morgenstern also tasked Druckman with obtaining American investors; Druckman made sustained contact with Ben Dawkins, a Stanford victim in Louisiana. *Id.* ¶ 123. Through that

relationship, Druckman secured additional American investors, and corresponded with them. *Id.* ¶ 124.

In 2012, Druckman worked 576 billable hours. *Id.* ¶ 131. He worked closely with Gartner to manage the group of recruited investors, which by then numbered almost 2,000. *Id.* ¶ 128. At Morgenstern's direction, Druckman maintained close contact with the largest investor-clients. *Id.* ¶ 129. He traveled twice more to Mexico in December. *Id.* ¶ 130.

In 2013, Druckman worked 720 billable hours. *Id.* ¶ 137. In March, Morgenstern filed the NAFTA arbitration; Druckman thereafter attempted to persuade existing Mexican clients to join the NAFTA action. *Id.* ¶¶ 133–134. He discussed the action with Stanford investors every day for four months and put together a substantial Mexican investor group. *Id.* ¶ 135. He maintained contact with clients in the arbitration and class actions. *Id.* ¶ 136.

In 2014, Druckman worked 576 billable hours. *Id.* ¶ 142. He added clients from Mexico, Colombia, and the United States, and responded to objections from the Receiver. *Id.* ¶ 138. In June, Druckman traveled to Miami to conduct a discovery investigation of files in the offices of Greenberg Traurig. *Id.* ¶ 140. On this trip, Druckman discovered the file showing Greenberg Traurig's awareness of the Stanford fraud. *Id.* ¶ 141.

In 2015, Druckman worked 740 billable hours. *Id.* ¶ 149. He engaged with clients daily. *Id.* ¶ 144. He made trips to Mexico to meet with lead class-action plaintiff Ruth Alfille de Penhos, and to brief clients. *Id.* ¶¶ 145–146. He was tasked with putting together the group of NAFTA arbitration plaintiffs. *Id.* ¶ 147. That year, Druckman's efforts concentrated on Penhos. *Id.* ¶ 150. He had developed a strong relationship with Penhos and suggested to Morgenstern that she be a class representative. *Id.* ¶¶ 150–151. On June 10, 2015, Penhos, as such, sat for a

deposition. *Id.* ¶ 154. Druckman prepared extensively for that deposition and represented her there. *Id.* The deposition transcript identified Druckman as "Of Counsel" for Butzel Long. *Id.*

In 2016, Druckman worked 480 billable hours. *Id.* ¶ 162. That year, he was "inundated with complaints and concerns from clients due to the lack of communication and resolution of their cases." *Id.* ¶ 157. Morgenstern told Druckman that, because the suit would proceed as a class action, he "really didn't [care]" about complaints from individual clients, and instructed Druckman to stop answering calls and emails from them. *Id.* ¶¶ 158–159. When Druckman did not cease client communications, Morgenstern instructed Gartner to insist that Druckman stop communicating with clients. *Id.* ¶ 159.

Druckman alleges that he worked a total of 4,812 billable hours on the Stanford litigation, "approximately 25%" of the overall hours Morgenstern and Butzel Long later reported in their fee application arising from their settlement with certain bank defendants. *Id.* ¶ 163. Druckman kept contemporaneous notes each day he worked between 2009 and 2016, and logged his daily client communications. *Id.* ¶ 164.

*i. Morgenstern Terminates Druckman*

In 2016, Druckman and Morgenstern's professional and personal relationship terminated. *Id.* ¶ 87. Druckman attributes this to an altercation in which Druckman confronted Morgenstern about his extramarital affair with the OSIC's Shaw, *id.* ¶ 85, an affair Druckman suspects began in 2011, shortly after the OSIC's inception, *id.* ¶ 76. In or around 2013, Gartner told Druckman that she knew of the affair and that Druckman should "help his friend." *Id.* ¶ 75. Gartner later told Druckman that Shaw was "becoming a problem" for Morgenstern, including behaving erratically and making threats toward him. *Id.* ¶ 78. Morgenstern likewise told Druckman at one point that Shaw "was 'crazy,' 'trying to ruin my marriage and get me [] off the case.'" *Id.* ¶ 79. Later, Morgenstern told Druckman he wanted to hire a private investigator to investigate Shaw.

*Id.* ¶ 80. He told Druckman numerous times that he was "done" with Shaw and would end the affair, but he did not do so. *Id.* ¶ 81. Druckman was uncomfortable with the affair—personally, as a friend of Morgenstern's wife, and professionally, because of the potential conflict of interest it presented concerning the OSIC. *Id.* ¶¶ 83–84.

In 2016, Druckman confronted Morgenstern about the affair in Druckman's backyard. *Id.* ¶ 85. That exchange "nearly turned physical" and became so loud that Druckman's wife, upstairs in their home, later asked Druckman whether Morgenstern was having an affair. *Id.* Soon after, Gartner informed Druckman via email that his services in the Stanford actions were no longer necessary. *Id.* ¶ 86. Druckman confronted Morgenstern about this email, and Morgenstern "assured" Druckman "that he would receive his share of any settlement or award." *Id.* Druckman and Morgenstern never spoke again. *Id.* ¶ 87.

*j. Class Certification is Denied; the OSIC Settles Its Claims and Secures Fees*

In 2017, class certification was denied in the action against the bank defendants. *Id.* ¶ 92.

In 2018, the OSIC and the Receiver settled their claims against Hunton & Williams for $71 million, including a fee award of $8,482,171.41 to Butzel Long and three other law firms. Compl. ¶ 68; *see also Janvey v. Greenberg Traurig, LLP*, No. 12 Civ. 4641 (N.D. Tex.), Dkt. 264 (Mar. 26, 2018).

In 2020, the OSIC and the Receiver settled their claims against Greenberg Traurig for $65 million, including a fee award of $15,896,235.75. Compl. ¶ 67[4]; *see also Janvey v.*

[4] The Complaint pleads that the firm settlements occurred in 2018. Compl. ¶ 88. But the Greenberg Traurig settlement was approved, and attorney's fees awarded, on February 25, 2020. *See SEC v. Stan. Int'l Bank, Ltd.*, No. 12 Civ. 4641 (N.D. Tex.), Dkt. 374 (Feb. 25, 2020). Because court filings are cognizable on this motion, the Court credits that the attorney's fee award in the Greenberg Traurig settlement occurred on February 25, 2020.

*Greenberg Traurig, LLP*, No. 12 Civ. 4641 (N.D. Tex.), Dkt. 374 (Feb. 25, 2020) ("Greenberg Traurig Award"). Three firms—Castillo Snyder P.C., Clark Hill Strasburger, and Neligan LLP—received a joint fee award in that settlement; Butzel Long and Morgenstern did not. *See* Greenberg Traurig Award at 5; Morgenstern MTD at 3.

The OSIC's cases against the bank defendants—including the claims against HSBC, TD Bank, and SG Suisse, for which Butzel Long would receive a share of any fees under the OSIC representation agreement, *see* AC ¶ 50 n.1—also continued after class certification was denied. *See id*. ¶ 166.

In 2023, the OSIC settled its claims with the bank defendants for more than $1.6 billion, of which Morgenstern and Butzel Long were awarded $69 million in legal fees for 21,000 hours of work. *Id*. ¶¶ 88, 166; *see also SEC v. Stan. Int'l Bank Ltd.*, No. 9 Civ. 298 (N.D. Tex.), Dkts. 3305 (SG Suisse fee award), 3334 (TD Bank fee award), 3335 (HSBC settlement fee award).[5]

*k. Morgenstern and Butzel Long Secure Fee Awards*

In 2018, when the OSIC settled its claims with Hunton & Williams, Morgenstern and Butzel Long were awarded $3 million in legal fees. Compl. ¶ 88. In 2023, when the OSIC settled its claims with the bank defendants, Morgenstern and Butzel Long were awarded $69 million in legal fees. *Id*. ¶¶ 88, 166. The $72 million cumulative fee award was "split in unknown proportions [between] Butzel Long, Morgenstern, and P.Morgenstern LLC." *Id*. ¶ 170.

[5] With the exception of the Greenberg Traurig settlement, the docket entries cited in this section are discussed in the Complaint and thereby incorporated by reference into the Complaint. Compl. ¶ 166. All such docket entries are independently cognizable on this motion because the Court may take judicial notice of court documents when deciding a motion to dismiss. *See, e.g.*, *Graham v. Select Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 502 n.1 (S.D.N.Y. 2016); *Russ v. Alt. Loan Tr. 2006-43-CB Mortg. Pass Through Certificates 2006-43-CB et al.*, No. 14 Civ. 2990, 2014 WL 3703870, at *2 (S.D.N.Y. July 23, 2014).

In Morgenstern's fee application in connection with the settlement with Hunton & Williams, Morgenstern represented that the proposed settlement and fee award "result[ed] from many years of effort, and thousands of hours of work by the OSIC, the Plaintiffs, and Plaintiffs' Counsel which is not specific to, but I believe helped bring about, the Hunton settlement." *Id.* ¶ 167.

In 2024, Druckman learned of the settlements and the fee awards. *Id.* ¶ 88.

**B. Procedural History**

On December 31, 2025, Druckman filed this lawsuit, via a summons and Complaint, in New York State Supreme Court in the Bronx. Dkt. 1 ¶ 1. It brings 10 claims: for (1) breach of oral contract; (2) breach of implied contract; (3) breach of the implied covenant of good faith and fair dealing; (4) fraud; (5) breach of fiduciary duty; (6) an accounting; (7) unjust enrichment; (8) quantum meruit; (9) promissory estoppel; and (10) for services rendered. Claim Three is brought against Peter Morgenstern only; Claims Seven and Eight are brought against all defendants; and the remaining claims are brought against Peter Morgenstern and P.Morgenstern LLC. *See* Compl. ¶¶ 172–231.

On February 5, 2026, the Morgenstern defendants removed this case to federal court based on diversity jurisdiction. *See* Dkt. 1 ¶ 7. On March 9, 2026, the Morgenstern defendants filed a motion to strike certain allegations in the Complaint, *see* Dkt. 20 ("Mot. to Strike"), and a motion to dismiss, *see* Dkt. 23 ("Morgenstern MTD"), and Butzel Long moved to dismiss the two counts against it, *see* Dkt. 18 ("Butzel Long MTD").[6] All three motions were fully briefed on May 27, 2026. *See* Dkts. 43–45.

[6] On March 13, 2026, the Court issued an amend-or-oppose order, giving Druckman the decision whether to amend the Complaint in response to the motions to dismiss, or oppose the motions and forgo his right to amend. Dkt. 33. Druckman elected to oppose the motion. Dkt. 39. The Court has stayed discovery pending resolution of the motions to dismiss. Dkt. 35.

## II. Applicable Legal Standards

### A. Motions to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the Court must accept all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet is "inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

Allegations of fraud—here, Count Four—additionally must meet the requirements of Federal Rule of Civil Procedure 9(b). *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To comply, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner*, 459 F.3d at 290 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

### B. Motion to Strike

Under Rule 12(f), on a motion or *sua sponte*, a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Federal courts have discretion in deciding whether to grant motions to strike."

*Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019) (Engelmayer, J.) (citation omitted). However, motions to strike under Rule 12(f) are generally "disfavored and granted only if there is a strong reason to do so." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 9 Civ. 2227, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013) (cleaned up); *see also FRA S. p. A. v. Surg-O-Flex of Am., Inc.*, 415 F. Supp. 421, 427 (S.D.N.Y. 1976) ("Unless it is clear that the portion of the pleading has no bearing on the subject matter of the litigation and that its inclusion will prejudice the defendant, the complaint should remain intact.").

## III. Discussion

### A. Motions to Dismiss

#### 1. Breach of Oral or Implied-in-Fact Contract

Count One alleges that Druckman "entered into an oral contract with Morgenstern, individually and/or as the sole member and officer of P.Morgenstern LLC, in which Morgenstern agreed to pay Plaintiff a percentage of legal fees based on work performed in the Stanford Litigations and NAFTA Arbitration," Compl. ¶ 173, and that Druckman "performed" under the contract by "work[ing] 4,812 billable hours on the Stanford Litigation," but that Morgenstern "breached" it "by failure to compensate" Druckman. *Id.* ¶¶ 175–176. Count Two alleges that Druckman and Morgenstern "entered into," and Morgenstern breached, "an implied-in-fact contract" with the identical substance. *Id.* ¶ 179. The Morgenstern defendants move to dismiss the two breach-of-contract claims on the ground that the Complaint does not adequately plead the existence of an enforceable contract. Morgenstern MTD at 6.

To state a claim for breach of contract under New York law, a complaint must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v.*

*Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted). "Conclusory allegations that a contract existed or that it was breached do not suffice." *Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16 Civ. 1099, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017) (citation omitted). A contract-breach claim "that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal." *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 213 (S.D.N.Y. 2021) (quoting *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009)).

"Under New York law, a contract may be express or implied." *Edwards v. Sequoia Fund, Inc.*, No. 18 Civ. 4501, 2018 WL 6039815, at *3 (S.D.N.Y. Oct. 18, 2018), *aff'd*, 938 F.3d 8 (2d Cir. 2019). An implied contract "may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506–07 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)).

Whether express or implied, "a contract will not be found to have been formed if it is not reasonably certain in its material terms." *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 359 (S.D.N.Y. 2012) (cleaned up) (quoting *Lapine v. Seinfeld*, 918 N.Y.S.2d 313, 318 (N.Y. Sup. Ct. 2011)). That generally requires "factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms." *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. App'x 102, 104 (2d Cir. 2012) (summary order).

The requirement that a complaint specify the alleged contract's major terms assures that, "before the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained." *Lan v. Time Warner, Inc.*, No. 11 Civ. 2870, 2014 WL 764250, at *2 (S.D.N.Y. Feb. 25, 2014) (citation omitted). A complaint thus "must set forth the material terms of the agreement, including the particular terms that were allegedly breached by the defendants." *Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 521 (S.D.N.Y. 2017).

The pertinent factual allegations to this effect in Druckman's Complaint are that (1) at some time between Morgenstern's February 2009 trip to Mexico City and his and Druckman's March 29, 2009 trip to Mexico City, Morgenstern "asked his close friend," Druckman, "to join him and take on the biggest case of their careers in consideration for a percentage of the legal fees awarded," Compl. ¶¶ 1, 28, 32; (2) Morgenstern "agree[d] that Druckman would receive his percentage of the legal fees that would be paid," *id*. ¶ 2; (3) Druckman and Morgenstern "agreed that they would work together to obtain relief for as many Stanford investors as possible and that they would share any awards, recoveries, and legal fees recovered in the proportion of the work they performed," *id*. ¶ 30; (4) Morgenstern "expressly represented" that Druckman "would receive his pro-rata share of any recovery based on the time he put in as a function of the amount received," *id*.; and (5) in 2016, after the men's altercation in Druckman's backyard, "Morgenstern assured Druckman that he would receive his share of any settlement or award," *id*. ¶ 86.

These allegations are insufficiently specific as to the terms of the alleged agreement. Indeed, it is arguable that the Complaint does not, other than in conclusory terms, plead an agreement between Druckman and Morgenstern. The allegation—that in February or March

2009, Morgenstern orally "asked" Druckman to assist him and that the two "agreed that they would work together to obtain relief for as many Stanford investors as possible" and would split profits, *id*. ¶¶ 1, 30–31—does not plead with specificity, for example, the "terms of the agreement" on which the Complaint asserts liability, or "other evidence supporting the formation of an agreement." *Posner v. Minn. Min. & Mfg. Co.*, 713 F. Supp. 562, 563 (E.D.N.Y. 1989); *see also id*. (existence of oral contract inadequately pled where complaint merely alleged that "defendant's assurances induced [plaintiffs] to lend money to" third party); *Window Headquarters, Inc. v. MAI Basic Four, Inc.*, No. 91 Civ. 1816, 1993 WL 312899, at *3 (S.D.N.Y. Aug. 12, 1993) (dismissing contract-breach claim where complaint alleged that lenders "agreed to advance funds" but did not plead terms of this contract). And although the contract-breach claims are brought against both Morgenstern and his law firm, it does not plead, other than conclusorily, that the parties agreed that their oral agreement bound the law firm as well as Morgenstern personally. *See* Compl. ¶¶ 172 (alleging that Druckman contracted "with Morgenstern, individually and/or as the sole member and officer of P.Morgenstern LLC"), 179 (same), 31 (suggesting that Druckman entered the oral agreement because he "trusted Morgenstern as they and their families were close friends and neighbors"); *cf. Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 458 (S.D.N.Y. 2006) (requiring "clear and explicit evidence" of defendant's intent to add personal liability to entity liability where individual signed agreement in corporate capacity (quoting *Mason Tenders Dist. Council Welfare Fund v. Thomsen Constr. Co.*, 301 F.3d 50, 53 (2d Cir. 2002))).

Even assuming that the Complaint pleads the existence in early 2009 of a broad agreement of some sort, it falls far short of pleading an agreement sufficiently definite as to be enforceable. The Complaint states that Druckman and Morgenstern "agreed that they would

work together to obtain relief for as many Stanford investors as possible and that they would share any awards, recoveries, and legal fees recovered in the proportion of the work they performed," and that Druckman "would receive his pro-rata share of any recovery based on the time he put in as a function of the amount received," Compl. ¶ 30, but that does not describe an agreement "reasonably certain in its material terms," and as such "there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989). That is so as to each side's obligations.

First, as to Druckman's obligations, the Complaint does not specify "the nature or quantity of the [] services" he was to provide. *Caro Cap., LLC v. Koch*, No. 20 Civ. 6153, 2021 WL 1595843, at *7 (S.D.N.Y. Apr. 23, 2021) (cleaned up), *on reconsideration*, No. 20 Civ. 6153, 2021 WL 2075481 (S.D.N.Y. May 24, 2021). The references to Druckman's Spanish proficiency, *see* Compl. ¶¶ 11, 26–28, and the allegation that Morgenstern "petitioned" Druckman to assist "because [he] needed a skilled Spanish speaking attorney who could help him sign up potential Stanford investor-victims as clients to be represented by Morgenstern," *id.* ¶ 28, support that Druckman was to play a role in communicating with investors, *id.* ¶ 30. But, critically, the Complaint does not allege whether Druckman's obligations under the oral agreement included providing legal as opposed to communications or translation services, and if so, what those legal services consisted of. The bare allegation that the men agreed that Druckman would use his Spanish facility to "sign up potential Stanford-investor victims as clients," *id.* ¶ 28, does not fill this void. *See, e.g.*, *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 362 (S.D.N.Y. 2018) (contract too vague to enforce where alleged agreement failed to "specify the type of [] work" to be performed); *Grayson*, 271 F. Supp. 3d at 521 (same, where agreement did not define "what tasks each party agreed to perform").

And although the Complaint seeks for Druckman a share of defendants' recovery for all of the matters on which they recovered in connection with the Stanford fraud, it does not plead an agreement as to Druckman's distinct responsibilities for each such matter. It does not state, for example, whether Druckman's agreed-upon obligations were limited to the class actions, the only suits of which Morgenstern is alleged to have conceived as of early 2009. *See* Compl. ¶ 25. As alleged, however, those cases did not yield any fees, as a result of the denial of class certification. *Id.* ¶ 92. The Complaint does not allege an agreement that Druckman would have responsibilities on future representations relating to the Stanford fraud, such as the OSIC and Receiver representations on which defendants won recoveries but on which the Complaint does not appear to allege that Druckman worked. *See id.* ¶¶ 118–119, 132, 138–139 (alleging that Druckman corresponded with the Receiver, but not that Druckman worked for the Receiver or for the OSIC).

Nor does the Complaint address any agreed-upon time parameters of Druckman's work. Was his work to be full time? Part-time? Ad hoc? Was the agreement time-limited or indefinite? And it does not allege agreement as to how Druckman's work was to be defined: Could Druckman *sua sponte* take on new workstreams? Or was he limited to projects assigned him by Morgenstern? Or also by partner(s) of Morgenstern? And, as to any area of work, the agreement as pled is silent as to any measure of quality.

For all these reasons, the oral agreement as pled does not supply a concrete measure as to Druckman's obligations, so as to reliably gauge whether he performed—a precondition for his claim of breach. *See, e.g.*, *Grayson*, 271 F. Supp. 3d at 521 (dismissing contract-breach claim on ground of indefiniteness where complaint "only provides that the parties entered into an agreement to 'work together' to 'cooperatively [and] successfully prosecute their [] cases, and

each benefit from their respective contingency fee'" but failed to indicate "what tasks each party agreed to perform," "what the parties understood to be 'successful prosecution,' and whether the parties had particular obligations to ensure that they received compensation from their [] clients beyond seeking successful resolution of the cases"); *Caro Cap.*, 2021 WL 1595843, at *8 (same, where alleged contract for "consulting services" did not specify "what actions" the parties "were to take with respect to each of the alleged oral contracts, what goal they were supposed to accomplish, and how long they had to achieve that goal"); *Liberty Harbor Coffee Inc. v. Moss*, No. 25 Civ. 1335, 2025 WL 2930290, at *10 (S.D.N.Y. Oct. 15, 2025) (same, where alleged agreement to perform "management, marketing, and branding" for coffee shop did not elaborate the "scope of these [] services"); *Foros Advisors*, 333 F. Supp. 3d at 361 (same, where alleged contract for "financial advisory" services did not include "scope of the expected advisory role, such as the expected work product or time commitment"); *Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 819 N.Y.S.2d 182, 185 (N.Y. App. Div. 2006) (same, where alleged agreement to enter into subcontract reserved to future agreement the "precise nature of the work to be subcontracted, price and manner of payment and time of performance").

Second, as to Morgenstern's (or his law firm's) obligations to Druckman, the Complaint is also hazy and unspecific. It alleges that the men orally agreed to share awards "in the proportion of the work [] performed" as measured by "the time he [Druckman] put in." Compl. ¶ 30. But, because the oral agreement as pled does not define the parameters of Druckman's work—what it was to be and what matters it was to cover—Morgenstern's commitment to share awards based on Druckman's share of the overall time worked is perforce indefinite.

This point is strikingly illustrated by the Complaint's treatment of the NAFTA arbitration and the OSIC litigations. The Complaint does not plead that in their agreement in early 2009,

the men agreed that Morgenstern would be obliged to pay Druckman for his work on as-yet unanticipated representations. Yet, in its claim for relief, it alleges that Morgenstern "agreed to pay Plaintiff a percentage of legal fees based on work performed in the Stanford Litigations and NAFTA Arbitration," *id.* ¶¶ 173, 179, even while alleging that Morgenstern did not conceive of the NAFTA arbitration until (at the earliest) late 2012, more than two years after the alleged oral agreement. *See id.* ¶ 70. And insofar as the Complaint appears to treat the "Stanford Litigations" as encompassing Morgenstern's representation of the OSIC in litigation against the firm defendants, this also did not commence until at least late 2012. *Id.* ¶ 64.[7]

Beyond the indeterminacy of the scope of Druckman's covered work, the oral agreement as pled did not address other matters material to Morgenstern's obligations. It did not address whether factors other than the hours worked (*e.g.*, the nature of the work performed) would play any role in the fee allocation. For example: Would translation services be valued the same as legal work? It did not address whether and, if so, how, the work of persons other than Druckman and Morgenstern on the covered matters (*e.g.*, Josh Abraham at Butzel Long, who later worked on these, *id.* ¶ 55) would factor into the fee calculation. It did not address whether this methodology uniformly applied across each covered matter or was to be tabulated on a matter-specific basis. It does not address how time was to be measured. Was the time spent to be

[7] The Complaint alleges that Druckman's 4,812 billable hours comprised "approximately 25% of the total hours" that Morgenstern and Butzel Long reported to the court in the bank settlements, Compl. ¶ 163, but there is no allegation that Morgenstern and Butzel Long's fee applications claimed fees on the basis of hours worked by Druckman. *See id.* ¶¶ 167–168 (alleging that "Morgenstern acknowledged" that the "settlements were the result of the hard work put into all Stanford-related actions by counsel," but not alleging that Druckman's hours were included in time reported to the court). Consistent with that, although not cognizable on this motion, defendants represent that Druckman's "time was not included in any of [the] fee applications." Morgenstern MTD at 5.

recorded on time sheets, and if so, how often were these to be submitted, if at all? Or were the time tabulations to be left to the recollections and estimates years later of the participating personnel?[8] And Morgenstern's 2016 assurance to Druckman upon the men's parting of ways—that "he would receive his share of any settlement or award," *id.* ¶ 86—apart from being unilateral and retrospective, does not fill these voids.

For these reasons, the oral agreement as pled is fatally vague, too, as to defendants' ostensible obligation to compensate Druckman. *See Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 841 (2d Cir. 1993) ("Generally, a purported contract that leaves the compensation term to be determined by future negotiations is 'a mere agreement to agree,' and under New York law is deemed too indefinite to be enforceable." (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)); *Lan*, 2014 WL 764250, at *2 (contract too indefinite to enforce where complaint lacked "specificity as to the form, frequency, and amount of payment"); *Yedvarb v. Yedvarb*, 655 N.Y.S.2d 84, 85 (N.Y. App. Div. 1997) (same). To be sure, an agreement to split fees *pro rata* can be sufficiently definite when a "reference to an extrinsic standard" permits a court to render the agreement "reasonably certain." *Mar Oil*, 982 F.2d at 840. For instance, where the parties manifested an intent to be bound, the court may supply a compensation term ascertainable by reference to industry practice. *Id.* But the Complaint does not supply any such metric, and, even if it had, the indeterminacy of the covered work would preclude its application. *See, e.g., Shtofmakher v. David*, No. 14 Civ. 6934, 2015

[8] The Complaint does not plead that Druckman ever submitted a time log to Morgenstern or his law firm. *See* Compl. ¶¶ 6, 163, 175 (claiming that Druckman worked 4,812 billable hours, but not that Druckman ever reported any such hours). And, although not cognizable on this motion, defendants represent that Druckman never submitted a time log in connection with any of the litigations. *See* Morgenstern MTD at 5.

WL 5148832, at *8 (S.D.N.Y. Aug. 17, 2015) (dismissing contract-breach claim where complaint lacked key factual allegations related to agreement's material terms, "including, most importantly, the particular terms for Plaintiff's compensation"); *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 611–12 (S.D.N.Y. 2010) (same, on ground that defendant's promise that plaintiff would be "compensated fairly" could not be rendered definite by plaintiff's suggestion that "one measure" to calculate "fair and reasonable value" was 2–3% equity interest "traditionally paid to persons providing the kinds of services" at issue); *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 326–27 (S.D.N.Y. 2009) (same, where contract contained "no methodology, formula, or external measure by which the Court might objectively determine the compensation to be paid"); *Georgiadis v. First Bos. Corp.*, No. 90 Civ. 7672, 1993 WL 22122, at *7 (S.D.N.Y. Jan. 26, 1993) (same, where contract "failed to set any standards that would determine the form or level of compensation due"); *Mar Oil*, 982 F.2d at 841 (same, where contract reserved to later agreement any hourly rate for attorney's services); *Freedman v. Pearlman*, 706 N.Y.S.2d 405, 408 (N.Y. App. Div. 2000) (upholding dismissal of contract-breach claim on ground that "the alleged promises made early in the parties' relationship to provide 'fair compensation' and to 'equitably' divide the draw were too indefinite to be enforced"); *see also Schafrann v. Karam*, No. 1 Civ. 647, 2003 WL 289620, at *5 (S.D.N.Y. Feb. 10, 2003) (plaintiff failed to "prove the existence of a valid oral contract concerning payment for legal services" where defendant "promised to pay plaintiff the reasonable value of his services when [enterprise] began making money," since such promise lacked "essential element" of "compensation"), *aff'd*, 81 Fed. App'x 391 (2d Cir. 2003) (summary order).

In sum, the Complaint's allegations related to the oral contract's formation and terms do not enable the Court to "ascertain[] what was promised and whether the Defendants' alleged

actions breached such promises." *Grayson*, 271 F. Supp. 3d at 521. They thus fail to state a claim for breach of either express or implied contract. *See, e.g.*, *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312–13 (S.D.N.Y. 2014) (dismissing contract-breach claim for lack of non-conclusory allegations regarding essential contract terms, including those upon which liability was predicated); *Caro Cap.*, 2021 WL 1595843, at *7 (same); *Grayson*, 271 F. Supp. 3d at 521 (same); *Shtofmakher*, 2015 WL 5148832, at *8 (same); *Lan*, 2014 WL 764250, at *2 (same); *Window Headquarters*, 1993 WL 312899, at *4 (same); *Posner*, 713 F. Supp. at 563–64 (same). The Court accordingly dismisses the two contract-breach claims.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Count Three alleges that Druckman and Morgenstern "entered into an oral contract" that is "valid, enforceable, and binding," Compl. ¶ 185; that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement," *id.* ¶ 186; and that the "breach" by the Morgenstern defendants "deprived" Druckman "of the benefits of [his] bargain," *id.* ¶ 187. The Morgenstern defendants move to dismiss Druckman's claim for breach of the implied covenant of good faith and fair dealing on the ground that no contract exists in connection with which such a covenant could arise. Morgenstern MTD at 11. "Because the duties imposed by the implied covenant of good faith and fair dealing arise as a result of the formation of a contractual relationship between the parties, a claim for breach of the implied covenant of good faith and fair dealing must be dismissed when there is no valid and enforceable contract between the parties." *Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 598 (S.D.N.Y. 2017); *see also Nat'l Gear & Piston*, 861 F. Supp. 2d at 366 ("A cause of action for breach of an implied duty of good faith and fair dealing . . . is properly dismissed for lack of a valid and binding contract from which such a duty would arise." (cleaned up) (quoting *Beekman Inv. Partners, L.P. v. Alene Candles, Inc.*, No. 5 Civ. 8746, 2006 WL 330323, at *7 (S.D.N.Y. Feb.

14, 2006))). In light of the holding above that the Complaint does not adequately allege an enforceable contract, the claim for breach of a covenant thereunder necessarily fails. *See, e.g.*, *Nat'l Gear & Piston*, 861 F. Supp. 2d at 366; *Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 714 N.Y.S.2d 338, 342 (N.Y. App. Div. 2000). The Court dismisses this claim.

**3. Fraud**

Count Four alleges that Morgenstern "repeatedly misrepresented to Druckman that Druckman would receive a percentage of legal fees based on work performed on behalf of Stanford victims," Compl. ¶ 189; that those representations were false because "Morgenstern did not have intention to pay Druckman any of the legal fees received," *id.* ¶ 190; and that Druckman reasonably relied, "to his detriment," on Morgenstern's "false promises," *id.* ¶ 192, which induced Druckman "to provide his legal services to Morgenstern in exchange for a portion of the settlement in the Stanford case and full reimbursement for expenses incurred," *id.* ¶ 193.

The Morgenstern defendants move to dismiss Druckman's fraud claim on the ground that it duplicates the contract-breach claims and, in any event, fails to state a claim. Morgenstern MTD at 11–14.

In arguing that the fraud claim must be dismissed as duplicative of its contract claims, the Morgenstern defendants invoke the principle that a fraud claim "based on the same facts as the cause of action to recover damages for breach of contract generally should be dismissed as duplicative of the contract claim." *Novick v. AXA Network, LLC*, 714 Fed. App'x 22, 24 (2d Cir. 2017) (cleaned up) (summary order); *see also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 198 (S.D.N.Y. 2011) (precluding fraud claim arising out of same facts as contract claim as duplicative) (citing *Telecom Int'l Am. Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001)). Here, however, the Complaint does not state a viable contract-breach claim. The Morgenstern defendants' argument that a fraud claim duplicative of a

*dismissed* contract claim must be dismissed all the same, *see* Morgenstern MTD at 11–12, lacks legal and logical support. They rely on *Caro Capital, LLC v. Koch*, which merely noted that the complaint's "allegations would at most support" a contract-breach claim that failed for other reasons, and then found fraud inadequately pled. 2021 WL 1595843, at *12; *see also* Morgenstern MTD at 12. *Caro Capital* is inapposite: The contract and fraud claims there were each inadequately pled. 2021 WL 1595843, at *7, 12. But there is no reason the factual allegations supporting an ill-pled contract claim could not potentially support a viable fraud claim.

That said, a fraud claim with the premise of the one here—that the defendant did not intend to perform its contractual duties—fails for a different reason: An action sounding in contract cannot "be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." *Simon v. Unum Grp.*, No. 7 Civ. 11426, 2008 WL 2477471, at *3 (S.D.N.Y. June 19, 2008) (cleaned up); *see also Sichel v. Unum Provident Corp.*, 230 F. Supp. 2d 325, 328 (S.D.N.Y. 2002); *Lomaglio Assocs. v. LBK Mktg. Corp.*, 892 F. Supp. 89, 94 (S.D.N.Y. 1995); *N.Y.U. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 768–69 (N.Y. 1995). Where the complaint fails to plead the existence of contractual obligations in the first instance, a fraud claim is doubly deficient.

Indeed, for multiple reasons, Count Four does not adequately plead fraud.

Under New York law, the elements of fraud are "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 141 (2d Cir. 1993); *see also Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 462 (S.D.N.Y. 2016), *aff'd*, 759 Fed. App'x 42 (2d Cir. 2019) (summary order). In federal court, fraud claims are subject to the heightened

pleading requirements of Federal Rule of Civil Procedure 9(b). It requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Negrete*, 187 F. Supp. at 462. "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99.

Under Rule 9(b) and New York law, "general allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support a claim for fraud." *Simon*, 2008 WL 2477471, at *3 (cleaned up) (quoting *N.Y.U.*, 87 N.Y.2d at 318). Because that is the fraud claim's thesis—that Morgenstern did not intend to pay Druckman his contractual fee—Count Four fails. *See Simon*, 2008 WL 2477471, at *3.

Even if Morgenstern's false promise to pay Druckman could support a fraud claim, the Complaint's allegation to that effect would fail. *See May Dep't Stores*, 1 F.3d at 141. It does not specify when and where the alleged misrepresentation(s) were made. Instead, it makes only hazy allegations to this effect. *Compare ATSI Commc'ns*, 493 F.3d at 99 (fraud claims must state "where and when" each allegedly fraudulent statement was made), *and Siegel v. Tucker, Anthony & R.L. Day, Inc.*, 658 F. Supp. 550, 552 (S.D.N.Y. 1982) (fraud claims adequately pled where plaintiff alleged misrepresentations took place "on or about August 5, 1981 . . . during lunch at a midtown restaurant"), *with* Compl. ¶ 28 (first alleged entreaty occurred at unidentified location some time "[a]fter the February 2009 trip to Mexico City"); ¶ 86 (last alleged assurance occurred at unidentified location "immediately" after Gartner communicated Druckman's termination,

which in turn occurred "[s]hortly after" the backyard confrontation in 2016), *and* ¶ 189 (alleging "repeated[] misrepresent[ations]" without detail). And for much the same reasons that the contract claims failed, the Complaint does not plead with particularity the substance of any fraudulent statement. That Morgenstern "repeatedly misrepresented to Druckman that Druckman would receive a percentage of legal fees based on work performed on behalf of Stanford victims," *id.* ¶ 189, is generalized in time and unspecific in content. *See Ricatto v. M3 Innovations Unlimited, Inc.*, No. 18 Civ. 8404, 2019 WL 6681558, at *10 (S.D.N.Y. Dec. 6, 2019) ("[A] claim of intentional misrepresentation [generally] cannot be predicated upon statements which are promissory in nature at the time they are made and which relate to future actions or conduct, because [m]ere unfulfilled promissory statements as to what will be done in the future are not actionable."); *Exceed Holdings LLC v. Chi. Bd. Options Exch. Inc.*, No. 17 Civ. 8078, 2018 WL 4757961, at *4 (S.D.N.Y. Sep. 30, 2018) (same); *Philips Credit Corp. v. Regent Health Grp., Inc.*, 953 F. Supp. 482, 520 (S.D.N.Y. 1997) (same).

The Court therefore dismisses the fraud claim.

**4. Breach of Fiduciary Duty**

Count Five alleges that Druckman and Morgenstern "undertook a joint venture to represent Stanford victims' interests in litigations against Stanford's banks and law firms"; that they "owed a fiduciary duty to one another"; and that Morgenstern breached that duty "by failing to disclose to Druckman that the Stanford Litigation cases had settled [and fees had been paid out] and failing to account to Druckman for his share of the legal fee awards." Compl. ¶¶ 195, 197–198.

The Morgenstern defendants move to dismiss the breach of fiduciary duty claim for failure to state a claim. Morgenstern MTD at 14–18.[9]

For a joint venture to exist under New York law:

> (1) two or more persons must enter into a specific agreement to carry on an enterprise; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.

*Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 411–12 (S.D.N.Y. 2011). "The absence of any one of these elements is fatal to the establishment of a joint venture." *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 102 (S.D.N.Y. 2013) (cleaned up) (quoting *Learning Annex Holdings*, 765 F. Supp. 2d at 412); *see also Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19 Civ. 7840, 2020 WL 5751195, at *12 (S.D.N.Y. Sep. 25, 2020); *Goureau v. Goureau*, No. 12 Civ. 6443 (PAE), 2013 WL 417353, at *4 (S.D.N.Y. Feb. 4, 2013); *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347–48 (S.D.N.Y. 2001). To plead the existence of a joint venture, "it is not enough" to plead that "the parties have agreed together to act in concert to achieve some stated economic objective." *Abbas Corp. v. Michael Aziz Oriental Rugs, Inc.*, 820 F. Supp. 2d 549, 554 (S.D.N.Y. 2011) (citation omitted); *see also N. Shipping Funds*, 921 F. Supp. 2d at 102.

Count Five does not meet these standards. Its assertion that Druckman and Morgenstern "agreed to share the profits and losses from their joint venture to represent Stanford victims' interests," Compl. ¶ 196, reprises the contract claims' allegations. *See id.* ¶¶ 28, 30. And for

[9] They also argue that this claim is fatally duplicative of the contract-breach claims, but for the reasons addressed above in connection with the fraud claim, because an enforceable contract has not been pled, the contract claim does not preclude this claim. *See supra* pp. 27–28; *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013) ("a plaintiff may not *maintain* both a contract claim and a breach of fiduciary duty claim" premised on identical factual allegations (emphasis added)).

much the same reasons that these allegations fail to allege an enforceable agreement, they fail to allege "a specific agreement to carry on an enterprise" and Morgenstern's "intent" to be bound by it. *N. Shipping Funds*, 921 F. Supp. 2d at 102. Indeed, because the Complaint does not allege "that the parties even discussed the prospect of forming a joint venture," and does not, other than conclusorily, allege an intent by either to do so, the Court "cannot glean [from it] any mutual intent to form a joint venture." *DIRECTV Grp., Inc. v. Darlene Invs., LLC*, No. 5 Civ. 5819, 2006 WL 2773024, at *6 (S.D.N.Y. Sep. 27, 2006).

Further, to the extent the Complaint alleges an agreement under which the two men agreed to "share the profits and losses" from their "joint venture," Compl. ¶ 196, its allegation that pay would be *pro rata* in proportion to "the work they performed," with Druckman paid "based upon the time he put in," *id.* ¶ 30, is insufficiently specific, for the reasons reviewed in connection with the contract claim. That two people agreed to "work together in a common attempt to accomplish some profitable result and make their pay in some way dependent in whole or in part upon their success" is classically insufficient to plead a profit-sharing agreement. *Chapman v. Dwyer*, 40 F.2d 468, 471 (2d Cir. 1930). And the Complaint is notably silent as to the allocation of the joint venture's losses, as required. Druckman argues that it was not necessary for a joint venture agreement to address that point because there was no reasonable expectation of losses. Dkt. 39 ("Opp'n") at 16–17. But that claim is in tension with the practical reality that legal representations including class actions entail incurring expenses, often large ones, which inherently makes for a net loss where the actions do not ultimately yield recoveries. (Indeed, the Complaint elsewhere recognizes that Druckman would incur expenses in connection with his work and claims entitlement to "full reimbursement for expenses incurred." Compl. ¶ 193.) Agreement as to how losses and profits will be shared is an "essential element of a joint

venture." *Precision Testing Lab'ys, Ltd. v. Kenyon Corp. of Am.*, 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986); *see also Jobanputra v. Kim*, No. 21 Civ. 7071, 2023 WL 5352400, at *6 (S.D.N.Y. Aug. 21, 2023) ("Without an agreement to share losses, no joint venture can exist, even if the parties agreed to share profits.").

Apart from these deficiencies, the Complaint does not adequately plead "joint control" over the alleged joint enterprise. *N. Shipping Funds*, 921 F. Supp. 2d at 102. It paints Morgenstern as all but fully in charge, alleging that he asked Druckman "for assistance" pursuing claims, Compl. ¶ 28, and that, upon his termination, Morgenstern through Gartner informed Druckman that his "help" was no longer needed, *id.* ¶ 86. And it repeatedly alleges that Druckman acted at Morgenstern's direction. *See, e.g.*, Compl. ¶¶ 93 (Druckman "was asked to undertake an enormous number of conferences" on a trip to Mexico with Morgenstern), 118 ("Druckman was tasked by Morgenstern with [] contacting clients to review" paperwork "deficiencies"), 123 ("Morgenstern [] asked Druckman to obtain some American investors"); 147 ("Druckman was delegated responsibility for putting together the NAFTA group of plaintiffs"). "[A] joint venture will not exist where one party has all, or virtually all, of the management of the business, and the other lacks independent decision-making authority or co-management or control." *Jobanputra*, 2023 WL 5352400, at *6; *see also McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985) (no joint management control exists where one party's "powers and responsibilities" are "limited by" the other and the former is "not able to operate outside of [the latter's] direction and control"). The Complaint does not identify any instance where Druckman asserted managerial control or acted independently of Morgenstern, save that, for a time, Druckman refused to heed Morgenstern's directive to "stop answering calls and emails from clients." Compl. ¶ 159.

The Court therefore dismisses the fiduciary duty claim, because the joint venture from which Morgenstern's duty is claimed to arise is ill-pled. It fails to allege a "specific agreement" to carry on an enterprise, with the "intent to be joint venturers" with "joint control," and with a provision for the sharing of profits and losses. *See N. Shipping Funds*, 921 F. Supp. 2d at 102.

**5. Accounting**

Count Six alleges that Druckman and Morgenstern "were joint venturers with respect to their work on behalf of Stanford victims," Compl. ¶ 202; that Druckman, "as Morgenstern's partner in the venture," had the "right to participate in the winding-up process," *id*. ¶ 203; that a joint-venture partnership "is wound up through an accounting," *id*. ¶ 204; and that Morgenstern "must provide an accounting to Druckman of the legal fees received by him in connection with the Stanford Litigations and NAFTA Arbitration," *id*. ¶ 206.

The Morgenstern defendants move to dismiss the claim for an accounting, because it presupposes a joint venture whose existence is inadequately pled, and because it fails in other respects to state a claim. Morgenstern MTD at 18–19.

To state a claim for accounting under New York law, "a party must allege (1) the existence of a fiduciary duty; (2) money or property entrusted to defendants which imposed on them the burden of accounting; (3) the absence of an adequate legal remedy; and (4) a demand for an accounting and a refusal." *Caro Cap.*, 2021 WL 1595843, at *13. The Complaint does not adequately plead these elements.

First, for the reasons above, the Complaint does not plead the existence of a joint venture. But that is the sole basis for its claim of a fiduciary duty. *See* Compl. ¶¶ 202–203; *see Byrd v. Brown*, 94 Fed. App'x 1, 2 (2d Cir. 2004) (summary order) (accounting claim "cannot stand" where "existence of a fiduciary relationship" not established); *Caro Cap.*, 2021 WL 1595843, at *15 (same).

Second, the Complaint does not plead that Druckman entrusted money or property to Morgenstern, a point Druckman admits. *See* Opp'n at 19. It instead alleges that Druckman was owed but was not paid a portion of the legal fees paid by the Stanford receivership estate to Butzel Long (and from it to Morgenstern). *See* Compl. ¶¶ 8, 88, 166. Druckman argues that this suffices, because "in partnership cases," the entrustment element is satisfied by "the transaction of business by the partnership producing profits or losses to be accounted for." Opp'n at 19 (citing *Yador v. Mowatt*, No. 19 Civ. 4128, 2021 WL 4502442, at *5 (E.D.N.Y. Sep. 30, 2021)). But the Complaint does not plead the existence of any partnership that included Morgenstern and Druckman save the ill-pled joint venture.[10] The Complaint thus does not plead the entrustment element. *See, e.g.*, *KJ Roberts & Co. v. MDC Partners Inc.*, No. 12 Civ. 5779, 2014 WL 1013828, at *12 (S.D.N.Y. Mar. 14, 2014) (accounting claim fails absent fiduciary or confidential relationship); *Beck v. CIT Grp./Credit Fin., Inc.*, No. 95 Civ. 5800, 1998 WL 655547, at *3 (S.D.N.Y. Sep. 24, 1998) (same); *Kastle v. Steibel*, 502 N.Y.S.2d 538, 539 (N.Y. App. Div. 1986) (same).

Third, the Complaint does not plead that Druckman ever demanded an accounting. It states only that "Morgenstern has refused to provide an accounting." Compl. ¶ 205. But it is silent as to a demand. To the contrary, it alleges that Druckman and Morgenstern "stopped speaking" after the backyard incident in 2016, *id.* ¶ 87, and it does not allege an alternative means by which Druckman made a demand.[11]

---

[10] The Complaint uses the word-stem "partner" in the context of Druckman and Morgenstern's relationship just once once—in Count Six, which alleges that "[a] partnership, including as between joint venturers, is wound up through an accounting." Compl. ¶ 204.

[11] As to the remaining element, the Complaint does not address the absence of a legal remedy, and Druckman's brief elides the point. *See* Dkt. 39 ("Opp'n") at 19–20. Had defendants been entrusted with money or property of Druckman—a point not pled—remedies to secure its return

The Court thus dismisses the claim for an accounting.

**6. Unjust Enrichment**

The Complaint's most substantial claim is for unjust enrichment. Brought against all defendants, Count Seven alleges that Druckman "conferred substantial benefits on" defendants, who in turn "reaped significant benefits" from that work, Compl. ¶ 208; that Druckman "was instrumental and played a significant role in the settlements that resulted in $1.6 billion to Stanford investors," *id.*; and that defendants benefited from Druckman's "efforts to get retained by thousands of clients, daily bilingual contact with the clients [and] Receiver, reviewing the clients' bank documents in Spanish, and constantly working to cure deficiencies identified by the Receiver," along with trips to South and Central America to meet with clients, among other tasks, *id.* ¶ 209. It alleges that it would be "against equity and good [conscience]" for the defendants to retain the value of the work that Druckman conferred on them and to deny him "a percentage of the $72 million in legal fees that they were awarded." *Id.* ¶¶ 210, 213.

Both groups of defendants move to dismiss, on multiple grounds. They first argue that this claim duplicates the contract and fraud claims. Morgenstern MTD at 19–20; Butzel Long MTD at 6–9. They cite case law that an unjust enrichment claim premised on "another violation of law" must be dismissed when the claim alleging that violation is dismissed. *See, e.g.*, *Wyse v. Metro. Com. Bank*, No. 24 Civ. 9108 (PAE), 2025 WL 2208161, at *26 (S.D.N.Y. Aug. 4, 2025); *Hua Xue v. Jensen*, No. 19 Civ. 1761, 2020 WL 6825676, at *13 (S.D.N.Y. Nov. 19,

---

would surely have been available, including actions for conversion or replevin. *See Shim v. Luxury Asset Cap., LLC*, 828 F. Supp. 3d 351, 356 (S.D.N.Y. 2026) ("Under New York law, conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." (quoting *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 133 (2d Cir. 2022))); *id.* at 356–57 ("In New York, the 'law of replevin governs actions for the recovery of stolen or wrongfully detained property.'" (quoting *Doré v. Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010))).

2020); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 291 (S.D.N.Y. 2014). That argument is unpersuasive. Druckman's Complaint identifies—independent of its ill-pled claims of other violations of law—an additional "basis on which to find that 'equity and good conscience' require" compensating Druckman: that for years, he worked without pay in defendants' service, in anticipation of some compensation. *Wyse*, 2025 WL 2208161, at *27. That Druckman's work was "instrumental" to and played a significant role in attaining the settlements that resulted in large fees for defendants plausibly alleges an entitlement on Druckman's part in equity and good conscience to compensation. *See* Compl. ¶ 208.

Defendants, however, have a substantial argument that the unjust-enrichment claim is untimely. Morgenstern MTD at 23–24; Butzel Long MTD at 5–6.

The limitations period under New York law for an unjust enrichment claim varies depending on the relief the plaintiff seeks. *Small v. LOGS Legal Grp. LLP*, 826 F. Supp. 3d 377, 399 n.10 (E.D.N.Y. 2026), *reconsideration denied sub nom. Bhoge v. Frenkel Lambert Weiss Weisman & Gordon LLP*, No. 25 Civ. 1831, 2026 WL 2566481 (E.D.N.Y. Aug. 14, 2026). It is six years for an equitable remedy and three years for monetary damages. *Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013) (citing, *inter alia*, *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134–35 (N.Y. App. Div. 2007)). Count Seven seeks "damages in an amount to be determined at trial," Compl. ¶ 214, but all agree the applicable limitations period is six years, as is correct, because this claim is "properly characterized as an equitable claim for disgorgement." *Matana*, 957 F. Supp. 2d at 494; *see also Access Point Med., LLC v. Mandell*, 963 N.Y.S.2d 44, 46 (N.Y. App. Div. 2013); Morgenstern MTD at 23; Butzel Long MTD at 5.

The limitations period begins to run "upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered."

*Matana*, 957 F. Supp. 2d at 494 (citing *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 364 (2d Cir. 2013)). The timeliness of this claim here turns on what the wrongful act was. Druckman argues that it was defendants' refusal to share the legal fees. *See Eisen v. Feder*, 850 N.Y.S.2d 412, 413 (N.Y. App. Div. 2008) (refusal to share fees triggered limitations period). Defendants argue that it was the completion of Druckman's work. *See Nwoye v. Obama*, No. 22 Civ. 1791, 2023 WL 4631712, at *14–15 (S.D.N.Y. July 20, 2023) (completion of work triggered limitations period), *report and recommendation adopted*, 2023 WL 5164156 (S.D.N.Y. Aug. 11, 2023), *aff'd*, No. 23-1178, 2024 WL 911753 (2d Cir. Mar. 4, 2024). The question matters, because Druckman filed the Complaint on December 31, 2025, *see* Compl. at 1, nine-plus years after Druckman was terminated by Morgenstern and ceased work, *id.* ¶¶ 85–87, 90, whereas the OSIC settled its claims with the bank defendants in 2023, *id.* ¶ 88, and with Greenberg Traurig in 2020, within the limitations period.[12]

Count Seven is most naturally read as alleging that Morgenstern and Butzel Long were unjustly enriched at the time they accepted Druckman's services, *i.e.*, through to his termination in 2016. The Complaint repeatedly so alleges. *See* Compl. ¶¶ 209 ("Defendants benefitted from Plaintiff's efforts to get retained by thousands of clients."); 210 ("It would be against equity and good [conscience] for Defendants to retain *the value of the work Plaintiff conferred upon them.*" (emphasis added)). To be sure, the Complaint contains broad allegations to the effect that it would be inequitable for defendants to enjoy the monetary fruits of their work, while Druckman, who logged substantial hours in defendants' service, went uncompensated. *See* Compl. ¶¶ 1 ("[A]fter seven continuous years of hard work, international travel, and thousands of hours put

[12] The OSIC's settlement with Hunton & Williams, however, occurred in 2018, more than six years before Druckman filed this lawsuit. Compl. ¶ 88.

in" by Druckman, "Morgenstern hid the fact that $72 million in attorney's fees had been awarded."), 8–9 (Morgenstern "made a conscious decision to turn his back on Druckman" and "did not pay Druckman a dollar" after the fee awards were finalized), 89 (Morgenstern "never told Druckman about these settlements and never paid Druckman anything for his seven years of dedicated work"); *see also Eisen*, 850 N.Y.S.2d at 413 (quasi-contract claim for later-disbarred attorney's referral fee ripened "when such cases were disposed of").

The Court thus assumes *arguendo* that the claim is timely to the extent premised on defendants' fee recovery against the bank defendants in 2023 and against Greenberg Traurig in 2020. But, on close analysis, those theories of recovery founder on the merits—as to fees attributable to the bank litigation, because Druckman's work was disconnected from that litigation; and as to fees attributable to the Greenberg Traurig settlement, because the Complaint alleges neither that Butzel Long or Morgenstern received fees in that recovery nor that Druckman had a preexisting right to the fees.

Under New York law, the elements of an unjust enrichment claim are: "(1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff is seeking to recover." *Reyes v. Upfield U.S. Inc.*, 694 F. Supp. 3d 408, 430 (S.D.N.Y. 2023) (cleaned up) (quoting *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)).

Had the class actions on which Druckman's work centered yielded monetary recoveries for Morgenstern and Butzel Long—and had Druckman sued within six years of those recoveries—he assuredly would have had a plausible unjust enrichment claim, on the ground that it was inequitable for defendants to enjoy a fee award while denying him any compensation for his work, centered on recruiting Spanish-speaking clients. And Morgenstern's 2009 promise to

compensate Druckman for those efforts would have made his equitable claim all the more plausible. Indeed, the Complaint alleges that Druckman's labors were integral to maintaining those actions. *See* Compl. ¶ 28 ("[W]ithout any clients, there would be no such actions.").

A claim of unjust enrichment, however, also requires that the defendant have been unjustly enriched—*i.e.*, that they received money to which they were not entitled—at the plaintiff's expense. *See Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012); *United States v. Bedford Assocs.*, 713 F.2d 895, 901 (2d Cir. 1983). And the Complaint does not plausibly allege that the defendants here were unjustly enriched by the settlement fee awards, or that these awards came at Druckman's expense.

As to the bank litigation, critical here, the Complaint is devoid of any allegation that Druckman's work played any role in the fee awarded to Butzel Long and Morgenstern in that litigation. In that action, they represented the OSIC, not individual Stanford victims. Compl. ¶ 88 ("[T]he OSIC settled its claims with the Defendant Banks and Morgenstern and Butzel Long [] received $69 million in legal fees."). Tellingly, the Complaint does not allege that, in their fee application, Morgenstern or Butzel Long reported any of Druckman's work-hours to the federal court in the Northern District of Texas that granted the award. *See id.* ¶ 166. Nor does it allege that that court was aware of—or in any other way relied—on Druckman's work in fashioning the fee award. The Complaint is silent, in fact, as to the substance of any filings or decisions in that litigation. *See id.* ¶¶ 166–167 (providing docket numbers and fee tabulations in the bank and firm settlements). The Complaint does not connect Druckman's work to that award. It does not allege that Druckman ever furnished Morgenstern or Butzel Long with records of his time, documentation which presumably would have been necessary for Druckman's hours to have been a basis for the award. On the basis of the pleadings, there is

therefore no basis to believe that, in accepting their share of the fee award in the bank litigation case, Morgenstern or Butzel Long received "a benefit to which" Druckman, not the defendants, was "entitled." *Bedford Assocs.*, 713 F.2d at 904.

The Complaint makes two factual allegations on this point, but neither salvages this claim. First, it alleges that Druckman "worked 4,812 billable hours on the Stanford litigation, approximately 25% of the total hours reported by Morgenstern and Butzel Long to the Court in each fee application." Compl. ¶ 163. But, even crediting that mathematical tabulation, it does not establish that any of the overall hours that Druckman worked "on the Stanford litigation" were reported to the court in support of the fee award in the *bank litigation* specifically, which was the only fee-generating proceeding as to which Druckman could have a timely claim.

Second, the Complaint alleges that Morgenstern, in an application in connection with one of the law-firm settlements, represented:

> [T]he proposed settlement at issue here and fee request [was] not only . . . the result of the specific efforts of counsel in the Hunton case, but also as resulting from many years of effort, and thousands of hours of work by the OSIC, the Plaintiffs, and Plaintiffs' Counsel which is not specific to, but I believe helped bring about, the Hunton settlement.

*Id.* ¶ 167. That broad statement does advert to work by the OSIC and its counsel outside the bank litigation. But it too is unconnected to Druckman. Morgenstern's reference was to "[p]laintiffs' counsel" in the OSIC matter, which Druckman (unlike Morgenstern) was not. Without more, Morgenstern's general statement about separate work that the counsel in the bank case had done in connection with the Stanford fraud cannot be plausibly read to incorporate by reference work by Druckman, which, undisputedly, was never put before the Texas court. *See id.* ¶ 168.

And, with a limited exception, the Complaint does not chronicle work of Druckman's in service of the bank litigation. As pled, his work was predominantly non-legal work keyed to

client recruitment and retention—work naturally associated with the unsuccessful class actions on which the Complaint alleges he and Morgenstern agreed in 2009 he would assist.[13] The one exception is the allegation that he prepared, and defended, a victim's deposition in the bank litigation. *Id.* ¶ 154. But there is no allegation that appearance was reported to the Texas court or played any role in bringing about the fee award. The Complaint thus does not plausibly plead that the defendants were unjustly enriched on the basis of Druckman's work.

As to the Greenberg Traurig settlement, the Complaint's deficiency is of a different nature. The Complaint does allege that Druckman played a role in that settlement's coming to fruition: In June 2014, Druckman "traveled to Miami" to "conduct an investigation on files in the possession of Greenberg Traurig," and there "discovered the 'smoking gun' in one of the files that proved Greenberg was aware of the fraud . . . ultimately resulting in a settlement." *Id.* ¶¶ 140–141. However, the Complaint does not plead that the defendants received any share of the fee award in the ultimate settlement with Greenberg Traurig. *See id.* ¶ 166. On this point, the Complaint alleges only that Butzel Long "retained an interest in any fee paid with respect to the Greenberg claims." *Id.* But Butzel Long and Morgenstern undisputedly were not among the firms awarded fees in that settlement. *See* Greenberg Traurig Award at 5 (awarding fees to Castillo Snyder P.C., Clark Hill Strasburger, and Neligan LLP). And the Greenberg Traurig settlement is not included in the "$72 million in attorney's fees" to which the Complaint routinely refers, Compl. ¶¶ 1, 8, 88, 166, 169–170, including in its claim for unjust enrichment, *id.* ¶ 210 ("It would be against equity and good conscious for Defendants to retain the value of

[13] This included recruiting clients, *id.* ¶¶ 91, 98, 103, 134–135, 138; communicating with clients, *id.* ¶¶ 96, 100, 103–105, 114, 116, 123–124, 129, 136, 157; liaising between clients and the Receiver to cure documentation deficiencies, *id.* ¶¶ 118–120, 138; performing translation services, *id.* ¶¶ 119–121; and reviewing documents, *id.* ¶¶ 140–141.

the work Plaintiff conferred upon them and not pay Plaintiff a percentage of the $72 million in legal fees that they were awarded.”).

Nor, relevant to both unjust-enrichment theories, does the Complaint plausibly plead that defendants were enriched at Druckman’s expense. Such would require pleading that the benefit Druckman seeks to disgorge from defendants had been conferred on them by Druckman. *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009). But, in the bank litigation, the fees that defendants received were paid to them by third parties, not Druckman, as part of the bank settlement. *See* Compl. ¶ 88. And, as noted, the fee application that produced those fees, as pled, did not incorporate work performed by Druckman. *See id.* ¶¶ 166–167. As to the Greenberg Traurig settlement, as noted, the Complaint does not allege that defendants received any fees, from Druckman, from Greenberg Traurig, or otherwise. *See id.* ¶ 166. Finally, the Complaint does not plead that Druckman otherwise had “any preexisting right to the fees” obtained from any litigation. *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 313 (N.Y. 2018). Absent such, “a plaintiff cannot recover under an unjust enrichment theory where the plaintiff did not pay the fees in question.” *Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 209 (S.D.N.Y. 2016); *see also id.* (“Other courts applying New York law have similarly rejected unjust enrichment claims where the plaintiff seeks to recover fees it did not pay.” (collecting cases)).

The Court thus dismisses the unjust enrichment claim.

**7. Quantum Meruit**

Count Eight brings a claim for quantum meruit. It alleges that Druckman “performed the legal services requested by and/or for the benefit of Defendants in good faith in connection with the Stanford Litigations and NAFTA Arbitration” and that “Defendants and the clients accepted” Druckman’s services, Compl. ¶ 216; and that these services had “tremendous value” and that

Druckman "had an expectation of compensation for his services as a percentage of a contingency legal fee award," *id.* ¶ 217. It seeks for Druckman "his percentage of the legal fees awarded," which it calculates as "in excess of $13,110,000." *Id.* ¶¶ 219–220.

Defendants move to dismiss this claim both as untimely and for failure to state a claim. Morgenstern MTD at 19–21; Butzel Long MTD at 13–15. This claim is clearly time-barred.

The statute of limitations for a quantum meruit claim in New York is six years. *Tarquino v. Muse Enters., Inc.*, No. 19 Civ. 3434, 2020 WL 3871512, at *4 (S.D.N.Y. July 9, 2020); *see also* N.Y. Civ. Prac. L. & Rules § 213(1). "Under New York law, a lawyer's right to recover in quantum meruit accrues immediately upon discharge." *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 263 (2d Cir. 2004) (emphasis omitted); *see also Cohen v. Grainger, Tesoriero & Bell*, 622 N.E.2d 288, 290 (N.Y. 1993); *Lai Ling Cheng v. Modansky Leasing Co.*, 539 N.E.2d 570, 573 (N.Y. 1989); *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of New York*, 754 N.Y.S.2d 220, 224 (N.Y. App. Div. 2002); *Butler, Fitzgerald & Potter v. Gelmin*, 651 N.Y.S.2d 525, 527 (N.Y. App. Div. 1997); *Turner v. Steve Brody, Inc.*, 264 N.Y.S.2d 867, 868 (N.Y. App. Div. 1965) (mem.).

The Complaint is explicit that Morgenstern discharged Druckman in 2016, at which point Druckman ceased work for (or even speaking to) Morgenstern. Compl. ¶¶ 85–87, 90. He brought this action on December 31, 2025, more than nine years later. It is thus untimely.

Druckman counters that, in attorney fee-sharing disputes, quasi-contract claims accrue when fees are awarded and payment is refused. *See* Opp'n at 26. That is wrong. A quantum meruit claim accrues immediately upon an attorney's discharge, even in cases where an ultimate fee award is uncertain. *See Universal Acupuncture Pain Servs.*, 370 F.3d at 264; *Tillman v. Komar*, 181 N.E. 75, 76 (N.Y. 1932) ("Since [an attorney] is entitled at the [time of discharge] to

enforce his claim by action, he need not . . . be compelled to await the outcome of the litigation from which he has been displaced."); *Smith v. Boscov's Dep't Store*, 596 N.Y.S.2d 575, 576 (N.Y. App. Div. 1993) ("Recovery on a quantum meruit basis is called for even where the attorney discharged without fault was employed under a contingent fee contract."). To be sure, although in general "quantum meruit valuation of services rendered by a discharged attorney can best be determined at the time of discharge, rather than some months or years later when the case finally ends," *Cohen*, 622 N.E.2d at 290, in the occasional case, valuation of the claim may benefit from a review of underlying litigation in full. *See Universal Acupuncture Pain Servs.*, 370 F.3d at 263–64. A court hearing a quantum meruit claim thus "has discretion to defer the determination of the fair and reasonable value of a discharged attorney's fees under quantum meruit until the conclusion of the litigation." *Tops Markets, Inc. v. Quality Markets, Inc.*, No. 93 Civ. 302, 2001 WL 392082, at *3 (W.D.N.Y. Apr. 4, 2001); *see also Universal Acupuncture Pain Servs.*, 370 F.3d at 264. But that discretion does not disturb the limitations doctrine, under which discharge triggers a lawyer's right to recover in quantum meruit.

The Court therefore dismisses the quantum meruit claim.

**8. Promissory Estoppel**

Count Nine alleges that Morgenstern "promised" Druckman "that he would be paid for a percentage of any legal fees award for his work on behalf of Stanford victims," Compl. ¶ 222; that Druckman reasonably relied on Morgenstern's promises because "he trusted [Morgenstern] as his lifelong friend and neighbor of over 25 years," *id.* ¶ 223; and that Druckman was injured "in that he undertook and provided substantial work, provided legal services, and paid expenses for" Morgenstern's benefit, *id.* ¶ 224. The Morgenstern defendants move to dismiss for failure to state a claim. Morgenstern MTD at 22.

"Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract." *Randolph Equities, LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009) (quoting *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 993 (S.D.N.Y. 1989)). To state a claim for promissory estoppel under New York law, a complaint must plausibly plead: (1) a "clear and unambiguous promise"; (2) "reasonable and foreseeable reliance by the party to whom the promise is made"; and (3) "injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995); *see also Ne. Plastic Surgery PLLC v. BlueCross BlueShield of Ill.*, No. 24 Civ. 9148, 2025 WL 1194446, at *2 (S.D.N.Y. Apr. 22, 2025). A claim for promissory estoppel must be premised on "a clear and unambiguous promise." *Ne. Plastic Surgery*, 2025 WL 1194446, at *2. "Vague and indefinite promises are not actionable under a theory of promissory estoppel." *Id.*; *see also Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, 705 F. Supp. 3d 194, 203 (S.D.N.Y. 2023).

For the same reasons that the terms of the alleged oral agreement between Druckman and Morgenstern are too indefinite to support a viable contract-breach claim, the Complaint fails to plead a "clear and unambiguous promise" sufficient to support a promissory estoppel claim. *Ne. Plastic Surgery*, 2025 WL 1194446, at *2. That is so both as to Druckman's work obligations, whose parameters the oral agreement did not define save in the haziest of terms, and Morgenstern's compensation obligations, which were likewise opaque. *See supra* pp. 19–24. The allegations pled fall far short of "the clarity and unambiguousness of statements such as '[w]e will buy the parts,' and '[w]e are going to buy them from you anyway,' which the Second Circuit requires" to find promissory estoppel under New York law. *Henneberry*, 415 F. Supp. 2d

at 450 (quoting *Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co.*, 804 F.2d 787, 793 (2d Cir. 1986)). They "leave[] open" what work will be compensable, in what cases, and under what circumstances, among other key details. *Id*. (statement that did not indicate "how much capital will be provided and when it will be provided" is ambiguous). And they are far from concrete in spelling out the "share" of fees for which Morgenstern stood to be responsible. *Rowe Plastic Surgery of N.J., L.L.C. v. Aetna Life Ins. Co.*, No. 23-8083, 2024 WL 4315128, at *4 (2d Cir. Sep. 27, 2024) (upholding dismissal of promissory estoppel claim where defendant was not alleged to have promised to pay a particular amount; promise was "ambiguous as to its scope and vague as to the terms").

The Court therefore dismisses the promissory estoppel claim.

**9. For Services Rendered**

The Morgenstern defendants, finally, move to dismiss Count Ten, for services rendered, on the ground that it restates the quantum meruit claim. Morgenstern MTD at 22. Druckman agrees that this claim sounds in quantum meruit. Opp'n at 20. For the reasons above, the Court dismisses this claim as time-barred.

**B. Motion to Strike**

The Morgenstern defendants move to strike certain allegations in the Complaint as irrelevant and scandalous.[14] These allege that Morgenstern was an alcoholic and had an extramarital affair with a member of the OSIC. *See* Mot. to Strike at 3. Druckman counters that these allegations would have had some "bearing on the subject matter of the litigation." *FRA S. p. A.*, 415 F. Supp. at 427; *see also* Dkt. 38 at 5–7.

---

[14] These are: portions of paragraphs 1, 20, 48, and 86; the entirety of paragraphs 75–85 and 161; and part of the section heading on page 18.

The Court denies this motion as moot. With or without the challenged allegations, the Complaint fails to state a claim. And Morgenstern does not seek relief other than the striking of the allegations, such that the dismissal does not leave a live controversy. *Compare Sall v. Seven Days*, No. 20 Civ. 214, 2022 WL 632931, at *5 (D. Vt. Mar. 4, 2022) (complaint's dismissal did not moot motion to strike where state law rewards successful strike motion with mandatory attorney's fee, preserving live controversy), *with Evercare Choice Inc. v. PKF O'Connor Davies, LLP*, No. 20 Civ. 2733, 2026 WL 1284171, at *11 (S.D.N.Y. May 11, 2026) (denying motion to strike as moot in light of dismissal of complaint), *and Modell v. Argonaut Ins. Co.*, No. 23 Civ. 1488, 2024 WL 495135, at *9 (S.D.N.Y. Feb. 8, 2024) (same).

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions to dismiss in full and denies as moot the Morgenstern defendants' motion to strike.

The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 16, 19, and 22, and to close this case.

SO ORDERED.

Paul A. Engelmayer

Paul A. Engelmayer
United States District Judge

Dated: October 15, 2026
New York, New York